

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-17-00379-CV

---

IN THE INTEREST OF H.S., A CHILD

---

On Appeal from the 158th District Court
Denton County, Texas
Trial Court No. 2012-20413-158

---

Before Sudderth, C.J.; Walker and Meier, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

In three issues, Appellant Mother appeals the trial court's modification order appointing Appellee Father the conservator with the right to designate Alice's[1] primary residence. We affirm.

### Background

Mother has three children. Prior to having a relationship with Father, she had Betty, who was eight at the time of trial. In 2011, she and Father had Alice, who is the subject of this suit. Mother and Father broke up at some time after Alice's birth, and in June 2014 the trial court entered an order that appointed Mother and Father as Alice's joint managing conservators, awarded Mother the exclusive right to designate Alice's primary residence in Denton or any contiguous county, and put in place a modified standard possession order. Mother and Alice moved to the Fort Worth area and in January 2016, Mother married Stepfather, and they had a son while these proceedings were pending. At the time of trial in August 2017, Alice, then six years old, was living with Mother, Stepfather, Betty, and her new, three-month-old baby brother. Also at the time of trial, Father was married to Stepmother and they had a four-month-old son.

---

[1]We have used aliases in an effort to protect the identities of the child and family members. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018).

## I. Modification proceeding

Father filed his petition to modify the 2014 Order in February 2016 and asked the trial court to give him the exclusive right to designate Alice's primary residence within Denton County and to award Mother standard visitation. In support of his request, he alleged that the "emotional wellness and health circumstances of [Alice] ha[d] materially and substantially changed" since 2014.

Five witnesses testified at trial—Father, Father's friend, Mother, Stepfather, and Rahna Cutting, a caseworker who was appointed by the trial court to perform a social study. The trial court also considered Cutting's written social study, in which she recommended that Father be awarded the exclusive right to designate Alice's primary residence.

### A. Communications to Alice and between the parents

Cutting testified that Alice appeared to be aware of the ongoing custody proceedings and that at one point Alice told her that Mother thought Father should go to jail. Cutting acknowledged that such a statement "can be" a normal statement by a child "[i]n this type of situation." But Cutting also testified to her belief that Alice was "a child in crisis" and that the parents' discussion of the custody issues in front of Alice caused "ongoing damage that continues to tear at a child's soul as they get older," and warned, "And if that talk is not stopped, she will pay a price."

Father alleged that Mother at times threatened him with contempt and with kidnapping during Father's visitation times. According to Father, Mother said he

3

"need[ed] to go away so that [he couldn't] be a part of [Alice]'s life and that it would be best if [he] was just in jail."

At trial, Mother admitted that both she and Father could be "very accusatory" and that they did not communicate well.

### B. Alice's health

Cutting and Father both testified to two primary concerns about Alice's health—respiratory issues and bedwetting.

Alice was born prematurely and, according to Father, has a history of respiratory issues. Father and Cutting expressed concerns that Mother did not properly care for Alice's respiratory ailments, particularly alleging that Mother did not take care of a congestion issue in January 2016 that lasted more than 30 days. Father admitted that he did not take Alice to a doctor regarding the congestion, but instead "had [his] own way to deal with it." Father also admitted that since 2015 Alice had not seen a doctor on a regular basis for her respiratory issues. Even so, Father said he was concerned about Alice's respiratory system, especially in light of the fact that both Mother and Stepfather smoked cigarettes.[2] Mother testified that she and Stepfather never smoked around Alice, but only outside.

According to Father, Mother's move to Fort Worth with Alice "really, really took its toll," and that was when Alice began having bedwetting issues. He testified,

---

[2]Father testified that when he or Stepmother picked up Alice from Mother's house, Alice sometimes smelled like cigarette smoke.

4

"When [Alice] has come home and she has spoken of things being said at the other home to her, towards her, around her, those are the times when she wets the bed the most." According to Father, when he attempted to talk to Mother about it, Mother avoided the topic or denied it.

Father also claimed that Mother did not cooperate with him to work through medical or dental problems Alice may have had, although he did not identify any problems she had experienced beyond the bedwetting and the congestion. Father admitted that he had not attempted to take Alice to a counselor about the bedwetting issue.

Mother testified that Alice occasionally wet the bed at her house, but she disagreed with Father about the cause, instead attributing the problem to Alice's failure to use the bathroom before bed or her drinking water before going to bed. Mother testified that Father had not communicated any bedwetting concerns in the past year and had not suggested that Alice see a counselor about it.

### C. Concerns about Stepfather

In her social study, Cutting recited Father's description of Alice's troublesome behavior that raised concerns about Stepfather:

> [Alice] moved six times before age four, and she started wetting the bed, having sleep issues, and her attitude changed after moving to [Fort] Worth. "She was scared to go home to her mom's house and did not want to leave [Father's] side." [Father] reported observing these issues began again when [Stepfather] came into the picture. "She would tell us she is afraid of him and tremble at hearing the name ["Stepfather."] He

alleged [Alice] told him, "When mommy is not around, [Stepfather] hits me and [Betty]" and [Mother] ignores [Father's] attempts to address it.

Cutting also reported that Alice told her that "if she and [Betty] do not go to sleep when they are supposed to, [Stepfather] will 'snap his belt' at them. She said he does not hit them with it, but 'he makes it snap loud[.']" Betty told Cutting that Stepfather "sometimes . . . yells" and that she and Alice were spanked "for lying or hitting and for not keeping [their] room clean."

In her social study, Cutting noted a concern with Stepfather's support system because his brother's wife had reportedly been involved with Child Protective Services (CPS) due to drug use.

Cutting and Father emphasized Stepfather's criminal history at trial. Stepfather admitted in the social study and at trial that he had a methamphetamine problem in the past and was arrested and charged with possession of methamphetamine in 2006. He testified that he received deferred adjudication in 2007 for the charge and a term of three years' probation, which he successfully completed, and the case was dismissed. He denied using any illegal drugs or abusing prescription pills or committing any other crimes since his 2006 arrest.

Despite Cutting and Father's emphasis on Stepfather's criminal history, the trial court gave that evidence no weight. During Stepfather's testimony, the trial court interjected, "And let me, I think, make pretty clear that that criminal history's not having any impact on the decision I make."

6

**D. School and daycare**

At the time of trial, Alice attended kindergarten and an afterschool daycare program. Father testified that Alice had had some discipline problems at the beginning of the year in school, but according to reports from her kindergarten teacher and the school counselor, Alice was doing well in school. Her kindergarten teacher wrote in response to a questionnaire from Cutting that Alice was "a very sweet girl and [was] always happy and clean and healthy-looking," was "average in academics," "ha[d] good attendance, [was] always on time and always ha[d] her supplies and work completed." The teacher reported that she had met both parents and both were willing to help out, that she had no concerns about Alice's physical or emotional wellbeing in or out of school, that Alice was "very social in a positive manner with both her adults and peers," and that Alice's "peers adore[d] her and she ma[de] and ke[pt] friends."

The counselor at the elementary school made a similar report to Cutting. The counselor reported that she had never seen Alice for any problems, that Alice's teachers were "always complimenting her on her behavior and manners," and that Alice was "at school regularly and prepared." The counselor also noted that it was apparent that Alice and Betty loved each other and that Alice "often look[ed] to [Betty] for emotional support." The counselor had no concerns regarding Alice's emotional or physical well-being and reported that Alice seemed well-adjusted, loved, and cared for by all involved. The counselor further noted that she had met Father

and Stepmother at the beginning of the school year but did not see them again after that.

Cutting admitted that Alice's school grades were okay and her attendance was good, but she expressed concern that Mother had "alliances" with the teachers at the daycare that "made it more difficult for dad to be a part of things there." Cutting and Father also alleged that Alice was often tardy because of Mother, but Mother testified that it was not a problem and asserted that Stepmother had also brought Alice to school late on occasion. According to Mother, she had brought Alice to school late on only three occasions during the school year, and each time was about "[a] minute" late. Mother said that it was important to her that her children were at school on time.

### E. Father's concerns about Mother

At trial, Cutting testified that Father was concerned that Alice "was not being well cared for in her mother's care, as far as her hygiene, as far as her education, her residential status." This was reflected in the written social study, where Cutting noted Father's description of Alice's emotional well-being as "somewhat of a roller coaster." Cutting also reported Father's statement that

> [s]ometimes things come up which make[] us curious about what really goes on at the other home. If [Stepmother] and I are having a discussion, [Alice] at times will tell us to stop fighting. There are still times she takes things in the wrong way. . . . Every now and then, she will pout, go hide somewhere and we have to search for her and calm her down. We have to explain that she did not get into trouble or

8

anything like that. Her behavior tends to be worse the longer she is at her mom's house.

The social study also described Father's complaint that Mother treated Alice "like a baby" and that Father and Stepmother had to work hard to boost Alice's self-esteem as a result.

Father also expressed concern to Cutting that he thought "[Mother] spreads hatred for him and badmouths him to everyone," and he described Mother as a "pathological liar" who puts her own needs above those of her children.

### F. Mother's concerns about Father

Cutting testified that Mother expressed concern that Father was "not interested in parenting or being present." Cutting reported in the social study that Mother described Alice as being cranky sometimes before Father's parenting time because she did not want to go. Cutting wrote:

> [Mother] reported only feeling concerned when [Alice] comes back from [Father] and "[Alice] just wants to be held. It's not every time but occasionally she will come home and just hold me tight and cry. I just sit down and rock her until she stops." [Mother] reportedly tries to soothe her; on these occasions [Alice] tells [Mother "]don't leave me.[" Mother] said she rocks her and reminds her how much she is loved and will always have a home. [Mother] stated, "[Alice] talks about how much she likes [Stepmother] and [Stepgrandmother], and that gives me the comfort to know that she is cared for while at her daddy's." She reported trying to think before reacting in these situations and the only time she stepped in was when [Alice] said ["]Daddy and I have a secret[."] "I told [Alice] we don't keep secrets at this house."

Mother told Cutting that Father was emotionally abusive toward her and Betty in the past and that she was concerned Father would be emotionally abusive to Alice

9

as she got older. She expressed her concern that "[Father] tells [Alice] things he shouldn't, 'because [Alice] says things to [Mother] like, "Mommy you're not fat, or Daddy and I have a secret[.""]' She denied ever saying that Father was a bad father, but she also described him as "narcissistic and degrading."

## G. Stability of Mother's residence

Even though Cutting and Father attempted to emphasize Mother's "multiple moves" in support of modifying the 2014 Order,[3] they admitted that most of her moves took place before the 2014 Order. They did not refute Mother's own testimony that she had moved once since that order was put in place, from Whitesboro to North Richland Hills, and that she had lived in her apartment in North Richland Hills for two and a half years by the time of trial.

The trial court indicated that Cutting and Father's attempts to characterize Mother's moves as material and substantial changes were not persuasive, stating during Father's testimony, "I know that - - where I'm at on the moves, it appears that mother has stabilized and that the vast majority of the instability in that area dates prior to the last final order."

---

[3]Cutting testified, "My concern is they have moved so many times and she's been in so many daycares prior to being in kindergarten." Cutting also attempted to rely upon Mother's alleged "multiple relationships" before her marriage to Stepfather, but she admitted that any such relationships took place before the 2014 Order.

10

In her social study report, Cutting expressed no qualms with either parent's home situation, noting, "No significant concerns were noted in either home." And she admitted in her testimony that both houses were "sufficient for the child."

## H. Cutting's recommendation

Cutting concluded her social study by noting that Alice is "dynamic" and "energetic" and shows a "healthy attachment" to Father, Stepmother, Mother, and Betty. Cutting did not state that Alice showed a healthy attachment to Stepfather, but she noted elsewhere in the social study that Alice "displayed a positive relationship with [Stepfather]." Cutting noted that both parents "express[ed] strong desires to provide a loving home environment for [Alice], and [Alice] appear[ed] to be comfortable and feel safe in both homes." She noted that Mother and Father displayed "concerning behaviors, primarily related to a lack of ability/willingness to 'co-parent.'" She listed the following "[i]ssues of concern":

- [Mother] and [Stepfather] both stated they have a close relationship/interaction [with Stepfather's] brother, whose wife reportedly had 'CPS' involvement because of drug use. Though they both denied any substance use by that brother, or that [Mother]'s daughters are ever babysat by the sister-in-law, [Stepfather]'s admitted history of 'meth' addiction and resulting felony charge give pause as to [Stepfather]'s company/support system.

- [Stepfather] is not allowed on a rental lease in his name due to his felony. [Mother] must continually renew short-term apartment leases to provide a home for the family.

11

- [Mother]'s relationship history does not reflect the maturity needed to promote stability and long-term support for her children.

Because [Father] provides a consistent residence (of almost six years), his wife is a ["]stay-at-home["] mother to be, and neither [Father] nor [Stepmother] have any criminal history, it is respectfully requested that the court consider the following recommendations:

- [Father] and [Mother] be named Joint Managing Conservators of [Alice].

- [Father] be granted the exclusive right to determine residency for [Alice] for purposes of school attendance. . . .

- [Mother] be granted expanded standard parenting time with [Alice], provided she can transport [Alice] to school on time.

## II. The trial court's order and findings

At the end of the trial, the trial court announced its final order:

The Court makes a finding of material and substantial change based upon changes in the child's behavior and communications to and around the child while mother is in possession of the child since the rendition of the last order. The modification would be in the best interest of the child based upon the communications to and around the child at the respective homes of the parties and the positive environment at the father's home. Further, I've considered the social study and the testimony of Ms. Cutting in reaching the findings and conclusions.

I'll reiterate again, I'm nowhere as uptight about the drug issue 11 years ago as Ms. Cutting was. And, again, we have trended to stability, but I'm making the ruling as I've laid out on the basis that I've laid out. So that's it.

The trial court granted Father's motion to modify; appointed Father as the conservator with the exclusive right to designate Alice's primary residence and the right to make educational, psychological, and medical decisions; ordered that Mother

12

be given extended standard possession of Alice; and ordered Mother to pay child support.

Upon Mother's request, the trial court entered findings of fact and conclusions of law. They include the following relevant findings:

**Findings of Fact**

. . . .

2. There has been a material and substantial change in circumstances of the child since the rendition of the prior order in this cause.

3. The ordered modification is in the best interest of the child.

4. It is in the best interest of the child of this suit, that [Father] and [Mother] be named as joint managing conservators for [Alice].

5. The standard possession order is in the best interest of the child of the suit.

. . . .

**Conclusions of Law**

. . . .

3. It is in the best interest of the child of this suit that [Father] and [Mother] be named joint managing conservators.

4. It is in the best interest of the child of this suit that [Father] have the exclusive right to designate the child's primary residence.

**Discussion**

## I. Standard of Review

We review the trial court's modification of the terms and conditions of a managing conservatorship for an abuse of discretion. *In re T.D.C.*, 91 S.W.3d 865, 872

13

(Tex. App.—Fort Worth 2002, pet. denied) (op. on reh'g); *see In re A.B.H.*, 266 S.W.3d 596, 601 (Tex. App.—Fort Worth 2008, no pet.) (op. on reh'g) (applying standard). A trial court abuses its discretion if it acts arbitrarily and unreasonably or without reference to guiding principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011); *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007). A trial court also abuses its discretion when it does not analyze or apply the law properly. *Iliff*, 339 S.W.3d at 78. Legal and factual sufficiency are not independent grounds of error in modification cases, but they are relevant factors in deciding whether the trial court abused its discretion. *T.D.C.*, 91 S.W.3d at 872.

Evidence is legally insufficient if (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999). In comparison, when we review the factual sufficiency of the evidence, we will set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.

14

1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

In determining whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we engage in a two-pronged inquiry: (1) Did the trial court have sufficient information upon which to exercise its discretion and (2) did the trial court err in its application of discretion? *T.D.C.*, 91 S.W.3d at 872. Mother's first and second issues relate to the first prong; she argues that the evidence is insufficient to support the trial court's findings that there had been a material and substantial change and its decision to designate Father as the parent with the right to designate Alice's primary residence. Her third issue, in which she argues that the trial court abused its discretion in making both determinations, relates to the second prong. To resolve her third issue, we must determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.*

## II. Change in circumstances

In order to obtain a modification of a conservatorship order, the moving party must show that there has been a material and substantial change in the circumstances of the child, a conservator, or other party affected by the order. Tex. Fam. Code Ann. § 156.101(a) (West 2014); *see In re J.A.J.*, 243 S.W.3d 611, 617 (Tex. 2007) (noting that trial court retains jurisdiction to modify a conservatorship order if it is in the child's best interest and the parent's or child's circumstances have materially and substantially

15

changed since rendition). The legislature enacted this requirement with an intention of ensuring stability and continuity for children. *Bates v. Tesar*, 81 S.W.3d 411, 426 (Tex. App.—El Paso 2002, no pet.) (discussing the history of standards for modification of conservatorship orders).

We review a trial court's determination of whether a material and substantial change of circumstances has occurred on a case-by-case, fact-specific basis. *See Zeifman v. Michels*, 212 S.W.3d 582, 593 (Tex. App.—Austin 2006, pet. denied).

Mother's argument focuses upon Cutting's and Father's testimony that the changed circumstances were Mother's multiple moves and Stepfather's criminal history as a "convicted felon." But the trial court was not bound by their testimony in making its determination and, in fact, the trial court expressly stated on the record that it was not going to consider those as changes in circumstances. Rather, the trial court based its finding of changed circumstances "upon changes in the child's behavior and communications to and around the child while mother is in possession of the child since the rendition of the last order."

Evidence of changed circumstances included Father's observations that Alice began to have sleep and bedwetting issues after she moved to the Fort Worth area with Mother. Mother's marriage to Stepfather is also evidence of a material change of circumstances with respect to Father's description of Alice as "scared to go home to her mom's house" after Stepfather came into the picture, Father's report that Alice was "afraid of [Stepfather] and tremble[d] at hearing [his name]," and Father's

16

allegation that Alice told him that Stepfather hit Alice and Betty when Mother was not around.

There was also evidence that Mother had been speaking of the proceedings around Alice; Cutting reported that Alice mentioned that Mother thought Father should go to jail. While Cutting acknowledged that such a statement can be "normal" in these situations, it was nonetheless a serious concern for Cutting, who warned that Alice "will pay a price" if such negative discourse continued.

Viewing this evidence in the light most favorable to the trial court's ruling, it is legally sufficient to support the trial court's conclusion that a material and substantial change had occurred. *See, e.g.*, *In re C.Q.T.M.*, 25 S.W.3d 730, 735 (Tex. App.—Waco 2000, pet. denied) (considering a party's remarriage and evidence regarding stepparent's conduct and abilities as evidence of a change in circumstances).

Considering all of the evidence presented at the hearing and in Cutting's social study, we hold that the evidence was also factually sufficient. As with many child custody cases, this is a he-said, she-said case. The trial court was in the best position to judge the credibility of the witnesses and the evidence before it. *See Niskar v. Niskar*, 136 S.W.3d 749, 753 (Tex. App.—Dallas 2004, no pet.). We do not view the evidence as so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. We therefore overrule Mother's first issue.

17

## III. Best interest of the child

In her second issue, Mother argues that the evidence is not sufficient to support the trial court's decision to designate Father as the parent with the right to designate Alice's primary residence.

A court's primary consideration in determining the issue of conservatorship must always be the best interest of the child. Tex. Fam. Code Ann. § 153.002 (West 2014); *J.A.J.*, 243 S.W.3d at 614. Courts may use a nonexhaustive list of factors to determine the child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *T.D.C.*, 91 S.W.3d at 873. Those factors include

(A)　the desires of the child;

(B)　the emotional and physical needs of the child now and in the future;

(C)　the emotional and physical danger to the child now and in the future;

(D)　the parental abilities of the individuals seeking custody;

(E)　the programs available to assist these individuals to promote the best interest of the child;

(F)　the plans for the child by these individuals or by the agency seeking custody;

(G)　the stability of the home or proposed placement;

(H)　the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)　any excuse for the acts or omissions of the parent.

*Holley*, 544 S.W.2d at 371–72. Other factors to consider in modification suits include the child's stability and the need to prevent constant litigation in child custody cases. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).[4]

In this case, the primary *Holley* factors that emerged through the testimony and social study were concerns about Alice's emotional and physical well-being and about Mother's statements about Father and the proceedings to or around Alice. The other factors are either inapplicable or are equal on both sides—for instance, there was no evidence that Alice expressed a preference, Cutting concluded that either party's home was suitable, both parents were married and worked from home by the time of trial and were available to care for Alice, and both parents' homes appeared stable.

Cutting's conclusion as written in her social study is flawed. The bases for her recommendation that the trial court appoint Father as the primary conservator were (1) Mother and Stepfather's close relationship with a sister-in-law who had previously been involved with CPS because of drugs, (2) Stepfather's past methamphetamine addiction and "felony conviction," (3) Mother's relationship history, and (4) Mother's history of moving often. The only evidence of the third and fourth factors

---

[4]Mother relies upon *V.L.K.* to argue that the trial court must be convinced that a change in custody will result in positive change for the children. *V.L.K.*, 24 S.W.3d at 342–43; *see also T.D.C.*, 91 S.W.3d at 873 (requiring that the appointment of a new conservator be a positive improvement for the child). This is based upon a prior version of the applicable statute; the requirement of a showing of "positive improvement" was not included in the amended version passed in 2001. Tex. Fam. Code Ann. § 156.101; *Lenz v. Lenz*, 79 S.W.3d 10, 12 n.1 (Tex. 2002) (acknowledging the amendment).

established that any relationship or residential inconsistencies took place long before the 2014 Order; thus, those bases cannot support the trial court's finding. *See In re Z.A.T.*, 193 S.W.3d 197, 209–10 (Tex. App.—Waco 2006, pet. denied) (noting that evidence of circumstances before the entry of the prior custody order is irrelevant).

Regarding Cutting's concern about Stepfather's prior drug use, the only evidence admitted to the trial court was that Stepfather had stopped using methamphetamine in 2007, more than ten years before trial. We also question Cutting's assertion that Stepfather could not be named on any apartment leases in light of Stepfather's uncontroverted testimony that he successfully completed probation and his methamphetamine possession charge was subsequently dismissed, indicating that he was never convicted of a crime. And it is apparent from the record that the trial court did not consider this evidence as significant to its overall determination.

But as we discussed above, Mother's move to the Fort Worth area and her marriage to Stepfather are both relevant and significant as they relate to Father's assertions that it was after that move that he observed a significant change in Alice. It was then, according to Father, that Alice began to wet the bed more and experience trouble sleeping. Father and Cutting also expressed concern regarding Alice's physical well-being, and Father reported that Alice had at least once suffered from congestion and respiratory issues that lasted for a month. He testified that Mother's and Stepfather's smoking habits risked exacerbating Alice's respiratory issues.

Cutting's social study also noted several other concerns about Stepfather that support a finding that keeping Mother as the primary conservator would not be in Alice's best interest. Cutting noted Father's report that Alice told him she was scared of Stepfather and that Stepfather hit her and Betty when Mother was not around, Alice's description of Stepfather snapping his belt at her and Betty, and Betty's report that Stepfather yells and spanks them. Cutting also noted her concern about Stepfather's relationship with his sister-in-law, who had been investigated by CPS for drug problems at some point.

Finally, the trial court based its decision in part upon Mother's discussions of the case in front of Alice that resulted in her report to Cutting that Mother wanted Father to go to jail. The trial court presumably took heed of Cutting's testimony that this sort of behavior can cause "ongoing damage that continues to tear at a child's soul as they get older." Indeed, statements to children that their other parent will be sent to jail have been recognized as potentially constituting emotional abuse of the child by promoting parental alienation. *See, e.g.*, *In re C.S.*, 264 S.W.3d 864, 874 (Tex. App.—Waco 2008, no pet.) (discussing parental alienation in the context of a request to modify a custody order within one year of its entry).

Viewed in the light most favorable to the trial court's decision, this evidence amounts to more than a mere scintilla and is therefore legally sufficient. *See Ford Motor Co.*, 444 S.W.3d at 620. And viewing the record as a whole, we do not view this evidence as being so weak, or so contrary to the overwhelming weight of all the

21

evidence, that the trial court's order should be set aside and a new trial ordered. *Pool*, 715 S.W.2d at 635. We therefore overrule Mother's second issue.

## IV. Discretion of the trial court

Mother argues in her third issue that the trial court abused its discretion by finding that there was a material and substantial change in circumstances and by designating Father as the parent with the exclusive right to designate Alice's primary residence. In reviewing the trial court's determinations, we must consider whether they were reasonable. *T.D.C.*, 91 S.W.3d at 872.

As discussed above, the trial court has wide discretion in making its decisions. *See Naguib v. Naguib*, 137 S.W.3d 367, 372 (Tex. App.—Dallas 2004, pet. denied). The evidence before it was conflicting, and a trial court commits no abuse of discretion simply because it has based its decision on conflicting evidence. *In re S.N.Z.*, 421 S.W.3d 899, 911 (Tex. App.—Dallas 2014, pet. denied). The trial court was presented with concerning evidence about Alice's increased bedwetting and statements about Stepfather made not only by Father but more importantly by Alice herself to Cutting. Alice also reported to Cutting directly that Mother had made statements that Father should go to jail. And the trial court was best situated to evaluate Mother's and Father's credibility, as well as the credibility of Cutting and Stepfather. *See Niskar*, 136 S.W.3d at 753. It is not for us to substitute our judgment for that of the trial court as the trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

Having reviewed the entire record before us, we cannot say that the trial court abused its discretion by finding a material and substantial change in circumstances and by finding that it was in Alice's best interest to appoint Father as the parent with the exclusive right to designate her primary residence. Accordingly, we overrule Mother's third issue.

## Conclusion

Having overruled Mother's three issues, we affirm the trial court's Final Order in Suit to Modify Parent Child Relationship.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: November 8, 2018